UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                                                    )<br>                                                     )<br>STEVEN McCARTY,                      )<br>                                                     )<br>          Defendant.                       ) | Crim. No. 05-09-B-W |

**RECOMMENDED DECISION ON MOTION TO SUPRRESS**

Steven McCarty is charged in a two-count indictment with violating federal firearms laws. He has moved to suppress all evidence obtained during a search of his apartment on the Fourth Amendment grounds that (1) the officers conducting the search failed to execute the state warrant during daytime hours, as required by Maine law and (2) the officers failed to knock and announce as required by the warrant (Docket No. 17). In addition, McCarty moves to suppress statements on the Fifth Amendment ground that they were made during custodial interrogation without the benefit of a Miranda warning. I recommend that the court **DENY** the motion based on the following proposed findings of fact and legal analysis.

**Proposed Findings of Fact**

On July 10, 2004, at approximately 4:18 p.m., an officer with the Waterville Police Department took a complaint from a woman who had formerly been defendant Steve McCarty's domestic partner. The complainant stated that she was separated from McCarty, but had very recently visited McCarty's apartment to collect some of her belongings and observed marijuana plants growing on the premises. The complainant stated that McCarty had a sawed-off shotgun on the premises, had threatened her with the weapon and also that McCarty had previously been institutionalized for mental health reasons. The complaint was relayed to Patrol Supervisor

Charles Rumsey, who assigned Detective Daniel Goss to address the matter around 5:30 p.m. Detective Goss arrived at the station between 6:00 and 6:15, received a briefing and then spoke with the complainant and learned the information previously related. Detective Goss also spoke with the complainant's sister, who confirmed the information provided by the complainant. Detective Goss thereupon set about drafting a warrant to search McCarty's residence based on probable cause to suspect that McCarty's apartment contained contraband marijuana plants. There was no mention of the shotgun in the papers submitted to the complaint justice that evening. Meanwhile, Patrol Supervisor Rumsey called BATF Special Agent Brent McSweyn to inform him of the presence of the sawed-off shotgun on the premises. The content and timing of their communication was not provided, but it is evident that Special Agent McSweyn expressed an intent to participate in the search of McCarty's premises.[1]

Detective Goss completed drafting his warrant at around 8:00 p.m., had it "approved" by a district attorney and obtained a complaint justice's signature at approximately 8:30 p.m. Although no plan had yet been devised for how the search warrant would be executed, it appears that officers scrambled to assemble in the parking lot of McCarty's apartment building and did so by approximately 8:56 p.m.[2] Present for the search were Patrol Supervisor Rumsey, Detective Goss, Officer Todd Burbank, Officer Shawn Weigelt, and an Officer Brame.[3] Special Agent McSweyn had yet to arrive and the officers went forward with the search conscious of the

---

[1] Detective Goss and Patrol Supervisor Rumsey both recalled that it was Rumsey who called Special Agent McSweyn. McSweyn recalled that it was Goss who called him. It also appears possible McSweyn was called around the same time Detective Goss was assigned to the case, possibly even before Detective Goss was instructed to pursue the matter, but the record is unclear as to when McSweyn was notified. According to McSweyn, he received the call in the late afternoon or early evening.

[2] Patrol Supervisor Rumsey gave the testimony that the officers assembled at 8:56. In order to do so his recollection was refreshed by reference to a Call for Service document kept in the ordinary course of department operations and the document itself was introduced in evidence. Defense counsel timely objected to this testimony on hearsay grounds. However, hearsay evidence is admissible in a hearing on a motion to suppress. Fed. R. Evid. 104(a), 1101(d)(1). See also United States v. Matlock, 415 U.S. 164, 174 (1974).

[3] Officer Brame was not available to testify because he has been deployed to Iraq. Detective Goss also indicated that an Officer Cloutier participated in the search. Officer Cloutier did not appear to testify at the hearing.

2

impending 9:00 p.m. deadline imposed by the daytime state warrant.  Defense counsel elicited testimony from Detective Goss to the effect that Goss did not feel it was imperative to execute the warrant that evening.  Nevertheless, that was the course of action the officers chose to follow.  Detective Goss also stated that he did not seek to obtain a nighttime, no-knock warrant because he was familiar with McCarty, knew him to be cooperative with police and had no fear for the officers' safety.

After assembling in the parking lot the officers proceeding through the large apartment complex to McCarty's second-floor apartment and formed a "stack" outside the door.  Patrol Supervisor Rumsey instructed Officer Brame to knock and announce their presence and, because it was the first time Officer Brame executed a search warrant, instructed him on what to do.  Officer Brame knocked on the door and announced, "Waterville police, search warrant."  According to Officer Burbank, a male later identified as Thomas Merrill opened the door from inside before the officers entered, just as Officer Brame was announcing "search warrant."[4]  The officers thereupon entered the room with weapons drawn, beginning with Officer Burbank, who carried a shotgun.  The premises were secured within two minutes of entry.  According to Rumsey, the Call for Service document reflects that a "Code 4" was issued at 8:58 p.m., which would signify that the apartment was secured as of that time.  Having gained entry and secured the apartment, the officers began searching within a minute or two of 9:00 p.m.

After the premises were secured, McCarty was taken, in handcuffs, into the living room of his apartment.  As the officers searched he sat either on the couch or on a table located in front of it.  Officer Burbank testified that he was instructed to stay with McCarty to ensure officer security and to make sure McCarty did not leave the premises.  Officer Burbank also testified

---

[4] The testimony reflects that there was a slight pause between the knock and the announcement as Patrol Supervisor Rumsey relayed instructions to Officer Brame.

3

that before commencing this duty he returned to the parking lot to stow his shotgun in a police cruiser.  There is no evidence that Burbank or any other officer brandished or trained a gun on McCarty while he waited in the living room.  While Officer Burbank waited with McCarty, McCarty asked to smoke a cigarette.  Officer Burbank accompanied McCarty outside of the apartment and may have removed McCarty's handcuffs at that time or else re-cuffed McCarty so that his hands were in front.  It is also possible that the handcuffs had been removed earlier by Detective Goss in response to McCarty's complaint about the handcuffs hurting him.  In any event, Burbank remained in close proximity to McCarty, restricting his movement.  As the search proceeded an officer located a short-barrel shotgun in a duffle bag behind the living room couch.  Detective Goss was notified of the discovery and Goss came into the living room to see.  Goss took up the bag, opened it and pulled out the shotgun in McCarty's presence.  As he did so, McCarty began to talk.  Specifically, McCarty volunteered that the gun was an antique and also stated something about either himself or his grandfather, from whom he received the gun, having worked as a mercenary soldier in several countries.  During these statements McCarty's movements were restrained as the handcuffs may or may not have been removed and he was in the immediate presence of at least two officers (Detective Goss and Officer Burbank).

  Very shortly after these statements were made, Special Agent McSweyn arrived.  McSweyn entered the living room and Detective Goss presented the shotgun to him in front of where McCarty was seated.  McSweyn took out a tape measure and measured the shotgun's barrel.  While the gun was being presented to McSweyn or while he was measuring it, and before McSweyn directed any questions to McCarty, McCarty stated that the shotgun was an antique, that it was his, and that it was "an old peacemaker."

Based on the barrel's length, McSweyn determined that the shotgun was illegal. However, he decided not to arrest McCarty that night and notified McCarty that he was not under arrest, was free to leave and did not have to answer any questions. McCarty stated that he understood what McSweyn was saying and continued to be talkative all the same. McSweyn then directed some questions at McCarty. According to McSweyn, he decided there was no need to give McCarty a Miranda warning because McCarty was no longer in custody at that time. McCarty then stated in response to questions that he had received the shotgun from his grandfather, that he had not registered it, that the barrel was its current length when he first obtained the gun, that he had cut down the stock in order to be better able to shoot it one-handed, that he had fired the shotgun and that it was in working order. Special Agent McSweyn remained on the premises for about 30 minutes and left before the Waterville police officers, who remained on the premises until 10:35 p.m.

### Discussion

McCarty's motion to suppress raises three issues: (1) whether the execution of the daytime state warrant between the hours of 8:58 p.m. and 10:35 p.m. violated his Fourth Amendment rights; (2) whether the officers violated the knock and announce rule; and (3) whether the officers subjected him to custodial interrogation without the benefit of a Miranda warning.[5] I address each issue in turn.

---

[5]   During the hearing McCarty attempted to interject a new issue by pursuing a line of questioning that was designed to determine whether the state warrant was really a sham federal warrant. However, I sustained an objection by the government and ruled that he could not pursue this line of questioning because he had never identified this issue as one of the bases for which he sought to suppress evidence. McCarty argued that the existence of the issue was only made apparent during the hearing, but I found that the facts giving rise to any such argument were fairly apparent from the record (police reports) and the issue should have been raised prior to the hearing, at the very latest in a reply brief filed after the Government's response. That the issue was identifiable from the facts is demonstrated by the government's response to McCarty's motion, in which it asserted, "The Government agrees with the Defendant that the warrant in this case was state in character." (Gov't Resp. at 4.)

A.  **The timing of the execution of the search warrant does not warrant the suppression of evidence.**

McCarty argues that the search of his premises was unconstitutional because the search was commenced on or about 9:00 p.m. and continued until 10:35 p.m. According to McCarty, the search "for all intents and purposes was a nighttime search" because it commenced only minutes before the expiration of daytime hours, as defined by Maine law. (Mot. to Suppress at 3, Docket No. 17.) Maine law defines daytime, for purposes of executing a search warrant, as the hours between 7:00 a.m. and 9:00 p.m. Me. R. Crim. P. 41(h) (West 2004). The warrant itself read: "This warrant shall be executed between the hours of 7:00 AM and 9:00 PM . . . ." (Search Warrant at 3, Docket No. 19, Elec. Attach. 1.) McCarty fails to cite any precedent supportive of his proposition. For its part, the government has identified a number of decisions on point which reflect a general consensus that execution of a daytime search warrant is not rendered unreasonable simply because the search extends late into the evening hours, so long as the search is commenced within the timeframe established by the relevant law. See, e.g., United States v. Balsamo, 468 F. Supp. 1363, 1391 (D. Me. 1979) ("Searches which begin during daytime and continue into the night are permissible, at least where no invasion of privacy or prejudice has been shown."); United States v. Bugard, 551 F.2d 190, 193 (8th Cir. 1976) ("We see no merit in suppressing the fruits of the search simply because the search was still in progress at 10:00 p.m. and was not completed before 11:00 p.m. . . . Searches which begin during daytime and continue into the night have been held not to violate the rule.") (citations omitted). In addition to these cases, the Maine Supreme Court has also ruled that it is not a Fourth Amendment violation for officers to continue searching a premises beyond the 9:00 p.m. timeframe prescribed by Maine Rule of Criminal Procedure 41. State v. Sargent, 2005 ME 78, ¶¶ 8-12, 875 A.2d 125, 127-28 (concluding that search commenced at 5 p.m. and ended at 11:00 p.m. did not generate a Fourth

6

Amendment concern because police did not stay any longer than necessary to complete the search, they stayed only until 11:00, they did not "intrude upon or frighten the residents by a late night entry" and the defendant failed to demonstrate any prejudice from the fact that the search lasted beyond 9:00 p.m.).  Although in this case the officers commenced their search at the very last minute available to them in order to conform their conduct to the strictures imposed by the state warrant, there has been no showing in this case of any heightened invasion of privacy or extra prejudice by virtue of the timing of the officers' entry.  Indeed, the circumstances reflect that the door was opened by an occupant and that everyone within the apartment was up and about when entry was gained.  As defense counsel was unable to controvert, depending on the resident's "life style," a 7:00 a.m. entry by police into a home could prove far more invasive of personal privacy than one occurring at 9:00 p.m.  Finally, the relevant standard for determining the admissibility of evidence obtained during this search is supplied by federal law, not state law. United States v. Watson, 61 Fed. Appx. 514, 520 (10th Cir. 2003) (unpublished opinion) ("[E]ven if the search was conducted during the 'nighttime' under Utah law, federal constitutional requirements govern admissibility in federal court of evidence seized under a search warrant entirely state in character.") (citing United States v. Gibbons, 607 F.2d 1320, 1325 (10th Cir. 1979)).  This search was commenced well within the federal guideline supplied by federal Rule 41(h) and extended only an hour beyond the guideline.  More significantly, there does not appear to be any constitutional standard "that forbids continuing a search at night, at least when doing so is reasonable." United States v. Young, 877 F.2d 1099, 1105 (1st Cir. 1989).  Under the circumstances presented there was nothing unreasonable about the officers' decision to knock and announce between 8:56 and 8:57 p.m. or to commence searching the apartment at 8:58 p.m.

7

**B.     The knock and announce rule is not implicated in this case.**

The second contention in McCarty's motion is that "discovery makes unclear whether the executing officers knocked or announced their presence before making entry." (Mot. to Suppress at 7.) The officers' testimony reflects and I have found that the officers did knock and announce and that an occupant of the apartment actually came to open the door before the police entered. Accordingly, there is no Fourth Amendment issue in this case related to the knock and announce rule.

**C.     McCarty was not subjected to custodial interrogation.**

The third and final argument made by McCarty is that the statements he made to the officers and to Special Agent McSweyn should be suppressed because they were the product of custodial interrogation, or its "functional equivalent," and he was never provided with a Miranda warning. (Mot. to Suppress at 7-8.) In its responsive memorandum, the government concedes that McCarty made some statements while he was handcuffed and in custody, but argues that these statements were not a product of any interrogation. (Gov't Resp. at 11, Docket No. 19.) According to the government, McCarty was no longer handcuffed when Special Agent McSweyn was in his presence and had been informed that he need not answer any of McSweyn's questions. As for these later statements, the government argues they were not the product of a custodial environment and, therefore, a Miranda warning was not needed and the responses provided by McCarty were voluntary. (Id. at 11-12.)

Because McCarty was not administered a prophylactic Miranda warning during the search of his premises, his motion to suppress would succeed if he were able to demonstrate that he was subjected to custodial interrogation. In order to do so, McCarty would have to prove that he was "in custody" when he made the statements he would have the court suppress and that the

statements were the product of interrogation or its "functional equivalent." United States v. Lopez, 380 F.3d 538, 545 (1st Cir. 2004). For purposes of the Fifth Amendment, "in custody" means that the defendant has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest. United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). Whether the restraint on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. Id. at 711. "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quotation marks and citation omitted). As for the "functional equivalent" of interrogation, the standard is whether "any words or actions on the part of the police [were] reasonably likely to elicit an incriminating response from the suspect." Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Statements made "freely and voluntarily without any compelling influences" are admissible in evidence. Miranda v. Arizona, 384 U.S. 436, 478 (1965).

    *a.*    *The statements made prior to McSweyn's arrival were not the product of interrogation.*

The government concedes that the statements made by McCarty to Detective Goss when Goss opened the duffle bag in McCarty's presence were made while McCarty was in police custody. However, those statements were not the product of interrogation or its functional equivalent. The evidence reflects only that Detective Goss pulled the shotgun out in McCarty's view; there is no evidence that Goss made any statements as he did so or that he even looked to McCarty for an explanation. These circumstances are not functionally equivalent to interrogation and, therefore, should not be suppressed.

9

>    b.   *The statements made in McSweyn's presence prior to being told he was not under arrest, was free to leave and need not answer any questions were also not the product of interrogation.*

Prior to informing McCarty that he was not under arrest, was free to leave and did not have to answer any questions, Special Agent McSweyn measured the barrel of the shotgun in McCarty's presence. At the time, McCarty was no longer in handcuffs. However, McCarty was also now in the immediate presence of at least three officers of the law, including a newly arrived ATF agent whom Officer Burbank described as sufficiently imposing to make Burbank feel less concerned about the fact that McCarty was no longer in handcuffs. On balance, a reasonable person standing in McCarty's shoes would likely have felt very unsure about his freedom of movement at that time. Nevertheless, even if McCarty reasonably believed that he was still in custody, Agent McSweyn's action of measuring of the shotgun's barrel was not functionally equivalent to interrogation. See United States v. Genao, 281 F.3d 305, 308, 310-11 (1st Cir.), cert. denied, 537 U.S. 901 (2002) (holding that officer's presentation of numerous packets of heroin and related paraphernalia to the defendant, coupled with the comment, "We've got a problem here," was not the functional equivalent of interrogation). Accordingly, the "old peacemaker" statement should not be suppressed.

>    c.   *The statements made in McSweyn's presence after being told he was not under arrest, was free to leave and need not answer any questions were the product of questioning, but not "custodial interrogation."*

The final group of statements are those made by McCarty in response to questioning from McSweyn, but after being informed that he was not under arrest, was free to leave and need not answer any questions. The government asserts that these statements were not made in a custodial setting because "[a] reasonable person in the Defendant's shoes would have understood that he had been given citations requiring him to appear at a later date, that the police were

10

packing up and leaving, that he was not under arrest, that he was free to leave, and that he did not have to answer questions." (Gov't Resp. at 12.) The problem with this argument is that there was no evidentiary basis provided at the hearing for the court to find that McCarty received a citation or that all officers other than Special Agent McSweyn were packing up and leaving the apartment. In fact, the latter description of the scene appears to conflict with the evidence that McSweyn was the first person to leave the premises that night and that Officer Burbank remained with McCarty throughout the entire encounter. In any event, I still conclude that a reasonable person in McCarty's shoes would have understood that his freedom of movement was restored after having the handcuffs removed and being informed that he was not under arrest, was free to leave [6] and did not have to answer any questions. Accordingly, the statements McCarty made in response to Special Agent McSweyn's questions were not the product of a custodial environment and, therefore, the fact that the questions were not preceded by a Miranda warning does not give rise to a Fifth Amendment violation.

## Conclusion

For the reasons stated above, I **RECOMMEND** that the court **DENY** the defendant's motion to suppress (Docket No. 17).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

---

[6] Although the occupant of a residence might not have any desire to "leave" the premises, a reasonable person under these circumstances would have understood that he was free to move about the apartment without restriction.

11

   Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                /s/ Margaret J. Kravchuk
                U.S. Magistrate Judge

Dated: July 25, 2005